UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JENNIFER ROWLAND,                          No. 3:12-cv-00549-HU

         Plaintiff,                        **FINDINGS AND
                                           RECOMMENDATION**

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

         Defendant.

Bruce W. Brewer
419 5th Street
Oregon City, OR 97045

    Attorney for Plaintiff

S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97201-2902

Franco L. Becia
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

Page 1 - FINDINGS AND RECOMMENDATION

1  HUBEL, Magistrate Judge:

2      Jennifer Rowland ("Rowland") seeks judicial review of a final
3  decision of the Commissioner of Social Security ("Commissioner")
4  denying her applications for disability insurance benefits ("DIB")
5  and supplemental security income benefits ("SSI") under Titles II
6  and XVI of the Social Security Act.  This court has jurisdiction to
7  review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).
8  For the reasons set forth below, the Commissioner's decision should
9  be AFFIRMED.

10                    **I. PROCEDURAL BACKGROUND**

11      On October 28, 2008 and May 10, 2010, respectively, Rowland
12  filed a Title II application for DIB and a Title XVI application
13  for SSI, alleging disability beginning September 2, 2006.  Those
14  claims were denied and, upon Rowland's request, a hearing was held
15  before an Administrative Law Judge ("ALJ") on August 24, 2010, at
16  which Rowland and a vocational expert ("VE") testified.  The ALJ
17  issued a decision denying Rowland's claim for benefits on September
18  10, 2010.  Rowland then requested review of the ALJ's decision,
19  which was subsequently denied by the Appeals Council on January 27,
20  2012. As a result, the ALJ's decision became the final decision of
21  the Commissioner that is subject to judicial review.  This appeal
22  followed on March 26, 2012.

23                    **II. FACTUAL BACKGROUND**

24      On August 17, 2007, Rowland was seen by Edward Goldberger
25  ("Goldberger"), M.D., of Arthritis Associates of Northwest Ohio.
26  Rowland reported experiencing "chronic pain in the low back which
27  radiates down both lower extremities" and "bilateral upper
28  extremity pain particularly in the upper arms." (Tr. 270.) Rowland

Page 2 - FINDINGS AND RECOMMENDATION

1  stated that "she had no significant musculoskeletal problems until
2  August 2006 when she was involved in a motor vehicle accident."
3  (Tr. 270.)  Goldberger noted that "[r]ecent laboratory workup ha[d]
4  demonstrated a slightly elevated [erythrocyte sedimentation rate],"
5  but her "rheumatoid factor, [antinuclear antibody], and [human
6  leukocyte antigen tests] were all negative or normal."  (Tr. 270.)
7  A lumbar magnetic resonance imaging ("MRI") scan from November 2006
8  was normal, as were cervical and thoracic x-rays from June 2007.

9       Goldberger tested Rowland for tender points characteristic of
10 fibromyalgia.   Finding those present, he diagnosed her with
11 fibromyalgia and provided an education sheet on that condition.  It
12 appears that Rowland qualified as having the required eleven or
13 more out of eighteen tender points.[1]  Goldberger's findings refer
14 to bilateral tender points being present on Rowland's lower
15 cervical spine, trapezius, supraspinatus, "upper costo-sternal
16 junction," "proximal forearm," glutes, and "medial fat pad." (Tr.
17 273.)    However, Goldberger did "not believe there [wa]s any
18 complicating neurologic problem or inflammatory disease."  (Tr.
19 273.)  In addition to receiving an education sheet on fibromyalgia,
20 Rowland was "counseled regarding regular sustained exercise for at
21 least 30 minutes, 3-4 times per week."  (Tr. 273.)

22      On May 18, 2007, Rowland visited Pamela Hackl ("Hackl"), M.D.,
23 complaining of continued pain in her upper and lower extremities.
24 Rowland reported that her pain was aggravated by "walking or

25

26

---

27 [1] *See Bales v. Colvin*, No. CV 12-08061-JEM, 2013 WL 3449194,
   at *5 (C.D. Cal. July 9, 2013) ("[T]he accepted diagnostic test for
28 fibromyalgia is that [the] [p]laintiff must have pain in 11 of 18
   tender points.")

sitting for prolonged periods" and that she "c[ould]n't tolerate sitting in [a] chair." (Tr. 237.) Rowland was instructed to take one 30-milligram Cymbalta pill a day to treat her chronic pain.

On May 25, 2007, Rowland had a follow-up visit with Hackl and reported no improvement in her pain while taking Cymbalta. Rowland also said she experienced "episodes of weakness" when talking on the phone or brushing her hair. Hackl increased Rowland's dosage of Cymbalta to sixty milligrams per day and prescribed 100 milligrams of Tramadol per day.

Rowland returned to Hackl's clinic on June 1, 2007. Rowland stated that "she [wa]s unable to work, unable to go to school, unable to even go to the movies because she c[ould]n't sit for prolonged periods." (Tr. 235.) Because Rowland reported problems with insomnia after her Cymbalta dose was increased, Hackl told Rowland to stop taking the medication. Hackl also increased Rowland's dosage of Tramadol to 200 milligrams per day.

Rowland's pain persisted and on July 2, 2007, Hackl discussed the possibility of fibromyalgia based on "pain . . . [at] all trigger points except those on [Rowland's] anterior chest." (Tr. 233.)

During an examination on July 30, 2007, Rowland told Hackle that she "ha[d] been doing extensive research on fibromyalgia." (Tr. 231.)

On April 23, 2008, Rowland visited Hackl complaining of "throbbing and sharp" pain in her knees. (Tr. 230.) She also reported experiencing mid-back pain and "some numbness in [her] toes." (Tr. 230.) Hackl's treatment notes references diagnoses of fibromyalgia and patella femoral pain syndrome.

Page 4 - FINDINGS AND RECOMMENDATION

On May 1, 2008, Rowland was referred to Probility Physical Therapy by Hackl for treatment of left knee pain.  After completing twelve physical therapy sessions, Rowland reported "50% improvement in [her] symptoms with increased walking tolerance and standing tolerance."  (Tr. 276.)

Rowland had a follow-up visited with Hackl on July 16, 2008. Rowland stated that her "leg pain [was] 3-4/10 tops."  (Tr. 227.)

The following month, Rowland told Hackl that she recently began working at Panera Bread, but couldn't handle more than two consecutive six-hour shifts without experiencing "fibromyalgia flair ups."  (Tr. 225.)  As a result, Rowland asked Hackl to provide her with a doctor's note.

On October 2, 2008, Rowland met with Hackl to discuss her fibromyalgia treatment.  Rowland said that Cymbalta and Lyrica had little or no benefit, but she found Tramadol "very helpful" in treating her pain.  (Tr. 223.)

In early November 2008, Rowland underwent a neurology consultation with Robert Grimm ("Grimm"), M.D., in Portland, Oregon.  Grimm noted that

> Rowland c[ould] stand in a routine Rhomberg position with her eyes open or closed and not lose balance.  In a heel-toes stance as well as when tandem walking, if she closes her eyes.  She loses her balance in such efforts.  She can stand on her heels and toes and mount a short hop on either foot.  There is no general case for limb weakness.

(Tr. 278-79.)  Overall, Rowland's "exam "reveal[ed] a number of subtle abnormalities of undefined origin of central and peripheral def[icits]—none of which have any obvious bearing on her chronic pain/ fibromyalgia syndrome."  (Tr. 279.)  Grimm's diagnostic impressions included, among other things: (1) a "[m]ildly abnormal

Page 5 - FINDINGS AND RECOMMENDATION

1  neurological examination," (2) "[m]oderate obesity," and (3)
2  "[d]iffuse, chronic pain syndrome; prior diagnoses of
3  fibromyalgia." (Tr. 277.)

4      On November 24, 2008, Rowland completed an adult function
5  report. Rowland described a typical day as consisting of waking up
6  and eating, showering, surfing the Internet on multiple occasions,
7  "attempting" to do homework, running errands when necessary, making
8  dinner, and watching television. Rowland indicated that her
9  fibromyalgia-related pain impacts her ability to sleep, work,
10  exercise, perform daily chores, stand, sit, and drive. Rowland
11  does not, however, have any difficulty in terms of personal care.
12  Rowland estimated that she can walk between thirty and sixty
13  minutes before needing to stop and rest, and her ability to sit
14  depends on the level of pain she is experiencing.

15      On February 5, 2009, Rowland had a twenty-five minute follow-
16  up visit with Grimm. (Tr. 281.) Rowland reported that she was
17  sleeping twelve to fourteen hours per day and was "in too much pain
18  to do anything." (Tr. 281.) However, Grimm also observed that
19  Rowland was "smiling, looking well and reporting 'I am getting a
20  lot of work [done].'" (Tr. 281.)

21      On February 11, 2009, Daivati Bharadvaj ("Bharadvaj"), a
22  naturopathic physician at Alive & Well Healing Arts, sent a letter
23  to the Oregon Depart of Human Services, which stated:

24      Rowland . . . has been my patient since Oct[ober] 24,
        2008 for addressing her pain from fibromyalgia. . . . All
25      imaging studies and laboratory evaluation[s] done . . .
        [have been] unremarkable . . . . She has tried, to no
26      avail, the typical treatment protocols for fibromyalgia
        including Lyrica, Cymbalta, Tramadol, exercise and
27      physical therapy, acupuncture, etc.

28          . . . .

Page 6 - FINDINGS AND RECOMMENDATION

1

2        . . . She started using Oxycontin for her
debilitating pain, but it just 'takes the edge off.'

3    After starting Oxycontin, she report[ed] increased
tolerance, and the need for higher doses to help ease the

4    pain. Her pain levels in her legs and back have been
reported as [nine] or [ten] on a 1-10 pain scale ([ten

5    being the] worst) . . . .

6        . . . .

7        From my perspective, as her naturopathic physician,
I observe her as being debilitated when she arrives for

8    her visits. . . . Her previous employment required her to
remain standing for hours at a time, which she is

9    currently not able to do at all. . . . I believe that she
will need some time off from work all together to focus

10   on regaining her health and well-being, as she is in no
shape to take on most mentally and physically demanding

11   assignments until her pain levels are better managed.

12   (Tr. 283.)[2]

13       On February 14, 2009, Rowland was referred to family nurse

14   practitioner Molly Aultz ("Aultz") by Bharadvaj.  After examining

15   Rowland, Aultz concluded that she "[d]oes not meet the diagnostic

16   criteria for fibromyalgia" and had "none of the common

17   comorbidities," *i.e.*, a concomitant but unrelated pathological or

18   disease process.  (Tr. 299.)  In particular, Aultz stated that,

19   "unlike the majority of fibromyalgia patients," Rowland "tends

20   toward hypersomnolence," *i.e.*, sleeping an excessive amount.  (Tr.

21   298.)  It is interesting to note that Rowland: (1) told Aultz a

22   current stressor was a cousin who was "angry at [her] for not

23   working," and (2) denied currently using illicit drugs or

24

25

26       [2] Bharadvaj attached to his letter the treatment notes from
Rowland's visits to Alive & Well Healing Arts.  Because Bharadvaj's

27   letter adequately summarizes his impression of Rowland, those
treatment notes will not be discussed individually in this

28   background section.

Page 7 - FINDINGS AND RECOMMENDATION

1 "marijuana in the past" even though she apparently "[k]eeps

2 marijuana on hand."  (Tr. 298.)

3       On April 28, 2009, Atulya Deodhar ("Deodhar"), M.D., a doctor

4 who specializes in rheumatology at Oregon Health & Science

5 University ("OHSU").   According Deodhar, Rowland "has [been

6 diagnosed with fibromyalgia] but her [primary car physician] is

7 worried that some of her pains may not fit with [fibromyalgia]."

8 (Tr. 328.)   After conducting a thorough examination of Rowland,

9 Deodhar's impression was as follows:

10         This is a [23-year-old] female here for follow up of
         [fibromyalgia].  She does not have any evidence of
11         autoimmune inflammatory disease.  She does not have
         rheumatoid arthritis and further blood or radiographic
12         testing would be not very useful.  She has Central
         Sensitization as the cause of her generalized pain
13         syndrome.  She also has morbid obesity at such a young
         age which is her major health problem.  Her anterior
14         thigh pains are suggestive of meralgia paraesthetica —
         compression of the lateral cutaneous nerve of the thigh
15         underneath the inguinal ligament.   This is obesity
         related too.

16

17 (Tr. 330.)

18       Deodhar recommended that: (1) Rowland's primary care physician

19 prescribe Zanafalex to be taken at bedtime for muscle relaxation

20 since she "complain[ed] bitterly about muscle spasms"; (2) Rowland

21 be referred to a metabolic clinic "made for morbid obesity"; and

22 (3) Rowland's primary care physician prescribe "short acting

23 hypnotic drugs such as [A]mbien, [S]onata or [R]ozarem for her poor

24 sleep."  (Tr. 330.)  He also indicated that Rowland was being sent

25 back "for trigger point injections."  (Tr. 330.)

26       On January 6, 2010, Colin Hoobler ("Hoobler"), a physical

27 therapist, sent Bharadvaj a letter stating: "Ms. Rowland ha[s]

28 progressed wonderfully throughout her course of [physical therapy]

Page 8 - FINDINGS AND RECOMMENDATION

following [eleven] sessions drastically reducing her pain even with moderate intensity exercise.  However, insurance limitations have precluded her from returning and thus we are discharging her from [physical therapy]."  (Tr. 342.)

On August 24, 2010, Rowland appeared and testified at a hearing before the ALJ.  At the time of the hearing, Rowland testified that she was twenty years old, five feet four inches tall and weighed about 235 pounds.  Rowland graduated from high school and, at one point, was pursuing a bachelor's degree in psychology through online courses.[3]  She was enrolled at Bowling Green University in the fall of 2007, but quit after one semester because attending classes ten to twelve hours a week was too physically demanding.

Rowland has never held a full-time job and last worked on a part-time basis (e.g., between eight to fifteen hours a week) in October 2008 at Panera Bread, where she prepared coffee and breakfast sandwiches and bused tables.  Rowland stopped working at Panera Bread because she was required to stand on her feet for significant periods of time and "[i]t became too painful."[4]  (Tr. 42.)  However, Rowland testified that her most significant barrier to employment is her inability to sit longer than thirty to forty minutes without experiencing back pain and/or spasms.

About four years prior to the hearing, Rowland testified that she was involved in a motor vehicle accident and began to

---

[3] During the hearing before the ALJ, Rowland testified that she "currently [was] not in school."  (Tr. 55.)

[4] Rowland also mentioned that Panera Bread declined to accommodate her request to work every other day.

Page 9 - FINDINGS AND RECOMMENDATION

experience pain in her lower back, spine, neck and shoulder.  Over the years, the pain has intensified and "spread out to other parts of [Rowland's] body," including her shoulder blades, legs, arms, and elbows.  (Tr. 45.)  She also experiences "lots of headaches." (Tr. 45.)  Rowland describes the pain as "a burning, stabbing, aching" sensation "all over [her] body."  (Tr. 45.)

According to Rowland, her doctors have performed "all the tests in the book and . . . tell [her] that there's nothing wrong with [her]" other than fibromyalgia and a Temporomandibular Joint Disorder ("TMJ"), which causes her headaches.[5]  (Tr. 47.)  In order to manage her TMJ and fibromyalgia-related pain, Rowland consumes one 15-milligram Oxycodone pill per day, three 30-milligram Oxycodone pills per day, three 100-milligram Neurontin pills per day, an unspecified dose of Savella twice a day, and an unspecified dose of Tramadol twice a day.[6]

Also on August 24, 2010, the ALJ received testimony from VE Patricia Ayerza ("Ayerza").  The ALJ asked the VE to consider a person of Rowland's age, education and experience, who is limited to sedentary work.  The VE testified that an individual with these limitations could perform the jobs of cashier II (*e.g.,* booth cashier and ticket seller) and electronics worker.  The ALJ then added the following limitations to the previous hypothetical: (1)

---

[5] The Court was unable to locate a diagnosis of TMJ in the record.

[6] The ALJ commented on the fact that Rowland was consuming a significant amount of narcotic medications on a daily basis.  (Tr. 49) ("I would characterize your . . . narcotic medication usage as significant.")   Indeed, the transcript contains numerous prescription refills for these medications.

Page 10 - FINDINGS AND RECOMMENDATION

the claimant would need a sit/stand option; and (2) the claimant would need to be limited to simple tasks "consistent with unskilled work." (Tr. 59.)  The VE testified that, "[a]t that level, [she] could offer the same two jobs because they will allow for a sit/stand option and they are simple, repetitive work." (Tr. 59.) Such a hypothetical individual could not sustain competitive employment, however, if they "would need to take unscheduled breaks during the day to lie down," which would "consistently exceed" the time normally allotted for breaks in the workplace.  (Tr. 59-60.)

### III. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

**A.   Legal Standard**

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser*, 648 F.3d at 724.  Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25.  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is

Page 11 - FINDINGS AND RECOMMENDATION

1  not disabled. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th
2  Cir. 2001); *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

3      The Commissioner bears the burden of proof at step five of the
4  process, where the Commissioner must show the claimant can perform
5  other work that exists in significant numbers in the national
6  economy, "taking into consideration the claimant's residual
7  functional capacity, age, education, and word experience." *Tackett*
8  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner
9  fails meet this burden, then the claimant is disabled, but if the
10 Commissioner proves the claimant is able to perform other work
11 which exists in the national economy, then the claimant is not
12 disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

13 **B.    The ALJ's Decision**

14      At the first step of the five-step sequential evaluation
15 process, the ALJ found that Rowland had not engaged in substantial
16 gainful activity since September 2, 2006, the alleged disability
17 onset date. At the second step, the ALJ found that Rowland had the
18 following severe impairments: fibromyalgia, pain syndrome, and
19 obesity. At the third step, the ALJ found that Rowland's
20 combination of impairments were not the equivalent of any of the
21 impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. The
22 ALJ therefore assessed Rowland as having the residual functional
23 capacity ("RFC") to perform sedentary work, subject to the
24 following limitations: (1) Rowland needs a sit/stand option; and
25 (2) she must be "limited to simple work consistent with unskilled
26 work." (Tr. 19.)

27      At the fourth step, the ALJ found that Rowland has no past
28 relevant work. At the fifth step, the ALJ found in light of
Page 12 - FINDINGS AND RECOMMENDATION

1  Rowland's age (*i.e.*, twenty years old at the time of alleged
2  disability onset), education, work experience, and RFC that there
3  were jobs existing in significant numbers in the national and local
4  economy that she could perform, including a cashier II and
5  electronics worker.   Based on the finding that Rowland could
6  perform jobs existing in significant numbers in the national
7  economy, the ALJ concluded that she was not disabled as defined in
8  the Act from September 2, 2006 (the alleged disability onset date),
9  through September 10, 2010 (the date of the ALJ's decision).

## IV. STANDARD OF REVIEW

11      The court may set aside a denial of benefits only if the
12  Commissioner's findings are "'not supported by substantial evidence
13  or [are] based on legal error.'"  *Bray v. Comm'r Soc. Sec. Admin.*,
14  554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec.*
15  *Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).   Substantial evidence
16  is "'more than a mere scintilla but less than a preponderance; it
17  is such relevant evidence as a reasonable mind might accept as
18  adequate to support a conclusion.'"   *Bray*, 554 F.3d at 1222
19  (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

20      The court "cannot affirm the Commissioner's decision 'simply
21  by isolating a specific quantum of supporting evidence.'"  *Holohan*
22  *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*,
23  180 F.3d at 1097).   Instead, the court must consider the entire
24  record, weighing both the evidence that supports the Commissioner's
25  conclusions, and the evidence that detracts from those conclusions.
26  *Holohan*, 246 F.3d at 1097.  However, if the evidence as a whole can
27  support more than one rational interpretation, the ALJ's decision
28  must be upheld; the court may not substitute its judgment for the

Page 13 - FINDINGS AND RECOMMENDATION

1  ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d

2  1149, 1152 (9th Cir. 2007)).

3  **V. DISCUSSION**

4  **A.   Rowland's Credibility**

5        Rowland first argues that the ALJ failed to provide clear and

6  convincing reasons for rejecting her testimony about the extent of

7  her limitations.   In *Morgan v. Commissioner of Social Security*

8  *Administration*, 169 F.3d 595 (9th Cir. 1999), the Ninth Circuit

9  explained what is required of an ALJ in order to discredit a

10 claimant's symptom testimony:

11           Without affirmative evidence showing that the claimant is
             malingering, the Commissioner's reasons for rejecting the
12           claimant's testimony must be clear and convincing.  If an
             ALJ finds that a claimant's testimony relating to the
13           intensity of his pain and other limitations is
             unreliable, the ALJ must make a credibility determination
14           citing the reasons why the testimony is unpersuasive. The
             ALJ must specifically identify what testimony is credible
15           and what testimony undermines the claimant's complaints.
             In this regard, questions of credibility and resolutions
16           of conflicts in the testimony are functions solely of the
             Secretary.
17

18 *Id.* at 599 (citations omitted).

19        Ninth Circuit case law demonstrates that clear and convincing

20 reasons "include conflicting medical evidence, effective medical

21 treatment, medical noncompliance, inconsistencies in the claimant's

22 testimony or between her testimony and her conduct, daily

23 activities inconsistent with the alleged symptoms, and testimony

24 from physicians and third parties about the nature, severity and

25 effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-

26 cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012).

27        In assessing a claimant's credibility, an ALJ may also

28 consider "(1) ordinary techniques of credibility evaluation, such

Page 14 - FINDINGS AND RECOMMENDATION

as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002); *Bray*, 554 F.3d at 1222 (defining substantial evidence as relevant evidence that a reasonable mind might accept as adequate to support a conclusion).

Here, the ALJ provided clear and convincing reasons for rejecting Rowland's symptom testimony, and those reasons were supported by substantial evidence. In her written decision, the ALJ found Rowland "credible to the extent she suffers from some impairments." (Tr. 20.) However, the ALJ rejected Rowland's "allegation that she is incapable of all work activity" because the evidence in the record reflected that Rowland's "functional limitations [were] not as significant and limiting as ha[d] been alleged." (Tr. 20.)

In support of this determination, the ALJ first discussed conflicting medical evidence and testimony from medical sources about the nature, severity and effect of the symptoms complained of. For example, although Rowland testified that her most significant barrier to employment is her inability to sit longer than thirty to forty minutes without experiencing back pain and/or

Page 15 - FINDINGS AND RECOMMENDATION

spasms, a lumbar MRI scan from November 2006 was normal, as were cervical and thoracic x-rays from June 2007.

In addition, Deohdar stated that Rowland's primary care physician was concerned that some of her symptoms were inconsistent with a diagnosis of fibromyalgia.  The primary care physician's concerns were confirmed by Aultz's examination, which revealed that Rowland "[d]oes not meet the diagnostic criteria for fibromyalgia" and had "none of the common comorbidities," *i.e.*, a concomitant but unrelated pathological or disease process.  (Tr. 299.) Importantly, Aultz stated that, "unlike the majority of fibromyalgia patients," Rowland "tends toward hypersomnolence," *i.e.*, sleeping an excessive amount.  (Tr. 298.)  In her written decision, the ALJ gave Rowland "the benefit of the doubt" and found fibromyalgia to be a severe impairment based, in large part, on Goldberger's August 2007 diagnosis.  It is inescapable, however, that Deohdar's statements, coupled with Aultz's findings, support the ALJ's ultimate conclusion that "the medical record as a whole . . . do[es] not support the severity of [Rowland's] allegations."  (Tr. 21.)

Indeed, in Deodhar's view, Rowland does not have rheumatoid arthritis and her generalized pain syndrome is caused by central sensitization (i.e., pain hypersensitivity).  But "her major health problem" is morbid obesity which contributes to her leg pains. (Tr. 330.)  The record is replete with examples where medical care providers recommended that Rowland exercise more often.  As the ALJ noted in her decision, when Rowland actually complied with these recommendations, she responded quite favorably: "Ms. Rowland . . . drastically reduc[ed] her pain even with moderate intensity exercise."  (Tr. 342.)

Page 16 - FINDINGS AND RECOMMENDATION

1    Moreover, Rowland reported experiencing "episodes of
2  weakness"—which would move around from her neck, shoulders, arms,
3  back, and legs, (Tr. 236)—while talking on the phone, brushing her
4  hair or lifting a magazine.  (Tr. 234, 236.)  Apparently, these
5  episodes made Rowland feel, for example, "like she ha[d] to put the
6  phone down or the brush down."  (Tr. 236.)  That testimony is in
7  direct conflict with Grimm's November 2008 neurological
8  examination: "There is no general case for limb weakness."  (Tr.
9  279.)  Rowland reported experiencing difficulty with basic self-
10 care activities such as brushing her teeth and taking showers. (Tr.
11 50.)  That testimony is in direct conflict with Rowland's adult
12 function report, which indicates that she has no problem with
13 personal care.  (Tr. 173.)

14    Rowland's activities were also inconsistent with her hearing
15 testimony.  During the August 24, 2010 hearing before the ALJ,
16 Rowland described her typical day as follows:

17        A.  A typical day for me, of course, this is depending
          on how I sleep, but usually I don't sleep through the
18        night and most days I'm not getting that deep REM so I
          won't wake up until 12:00/1:00 o'clock [in the afternoon]
19        and for most of the day, I'm in bed.  I get up and I'll
          eat something and I'm just laying in bed most of the day
20        because –- either because I'm tired because I haven't had
          that good sleep or because I'm in so much pain that I
21        can't physically exert myself to do anything else or it
          could also be from the side effects from my
22        medication . . . oxycodone makes me very sleepy so if
          I've taken a pill, it could – it can totally just knock
23        me out.  So I'm sleeping on and off throughout the day.

24        Q.  Do you do some chores when you're not sleeping?

25        A.  I attempt doing the dishes. Vacuuming is – can be
          very difficult to do – standing up like that and moving
26        my body like that.  I can't just get up and brush my
          teeth for instance.  It takes me a while to actually once
27        I get up to actually anything like that.  Showers are
          very difficult.

28

Page 17 - FINDINGS AND RECOMMENDATION

1  (Tr. 50.)

2       Two days later, on August 26, 2010, Rowland told Vladimir Fiks
3  ("Fiks"), M.D., that she would be leaving Oregon for a seven-week
4  trip to Pittsburgh, Pennsylvania in early September.  (Tr. 422.)
5  This report is very difficult to reconcile with the virtually bed-
6  ridden individual described to the ALJ.  Interestingly, Rowland
7  presented the same story to Fiks in October 2010, when she
8  requested seven weeks worth of opiate medications in advance of a
9  trip to Pennsylvania.  (Tr. 435.)  Fiks said he would not "give her
10 [seven] weeks of [opiate] medications," nor was he willing to
11 prescribe Rowland Benzodiazepine: "The patient requests medications
12 for anxiety [and] no sleep but I have informed her I will not
13 prescribe antidepressants or Benzodiazepine to a patient who is
14 leaving for [seven] weeks, plus benzodiazepines are not a
15 medication I am willing to prescribe at all."  (Tr. 435.)  Fiks
16 also noted that he needed to discuss Rowland's last urine drug
17 screening ("UDS") because it tested positive for Hydromorphone.
18 (Tr. 435.)

19      Lastly, the record could have arguably supported a finding
20 that Rowland's work history and/or lack of a propensity to work
21 negatively affected her credibility regarding her inability to do
22 so.  In *Thomas*, the Ninth Circuit held that the ALJ gave specific,
23 clear and convincing reasons for discounting the claimant's
24 testimony.  *Thomas*, 278 F.3d at 959.  Notably, the Ninth Circuit
25 emphasized that, in addition to finding no objective medical
26 evidence to support the claimant's description of pain and
27 limitations, the ALJ found that the claimant had an "extremely poor
28 work history" and "ha[d] shown little propensity to work in her

Page 18 - FINDINGS AND RECOMMENDATION

1  lifetime," which negatively affected her credibility regarding her

2  inability to work.  *Id.*

3      In sum, the ALJ's credibility finding was clearly supported by

4  substantial evidence in the record.  The Court will not engage in

5  second-guessing.

6  **B.    Sit/Stand Option**

7      Next, Rowland argues that the ALJ erred as a matter of law

8  because she did not specify the frequency of the sit/stand option.[7]

9  *See* Social Security Ruling ("SSR") 83-12, 1983 WL 31253, at *4

10 (1983) ("Unskilled types of jobs are particularly structured so

11 that a person cannot ordinarily sit or stand at will.  In cases of

12 unusual limitation of ability to sit or stand, a [vocational

13 expert] should be consulted to clarify the implications for the

14 occupational base."); SSR 96-9p, 1996 WL 374185, at *7 (July 2,

15 1996) ("The RFC assessment must be specific as to the frequency of

16 the individual's need to alternate sitting and standing.  It may be

17 especially useful in these situations to consult a vocational

18 resource in order to determine whether the individual is able to

19 make an adjustment to other work.")[8]

20     In *Swofford v. Commissioner Social Security Administration*,

21 No. 3:12-cv-00557-MA, 2013 WL 3333063 (D. Or. July 1, 2013), as

22 here, the claimant argued that "the ALJ was required to specify for

23 how much time [the claimant] could sit or stand in the 'sit/stand

24

25     [7] (Pl.'s Opening Br. at 9) ("[The ALJ] did not specify

26 alternation frequency and erred thereby as a matter of law.")

27     [8] With respect to Rowland's ability to sit or stand, the ALJ

28 consulted a vocational expert to clarify the implications for the
   occupational base, consistent with SSR 83-12 and SSR 96-9p.

Page 19 - FINDINGS AND RECOMMENDATION

1  option.'"  *Id.* at *6.  In affirming the Commissioner's denial of

2  benefits, Judge Marsh concluded that such an argument was "without

3  merit," stating: "[C]ommon sense dictates that a 'sit/stand option'

4  means exactly what it says; [the claimant] must have the option to

5  either sit or stand at work.  This is consistent with a requirement

6  that [the claimant] have the ability to 'sit or stand at will.'"

7  *Id.*

8      Similarly, in *Buckner-Larkin v. Astrue*, 450 F. App'x 626 (9th

9  Cir. 2011), the claimant argued that her RFC was incorrectly

10 determined because the ALJ did not set forth a function-by-function

11 assessment.  *Id.* at 627.  The Ninth Circuit rejected this argument,

12 noting in particular that the claimant's RFC "included a sit-stand

13 option, which [wa]s most reasonably interpreted as sitting or

14 standing 'at-will,' based on the record."  *Id.*

15     As in *Swofford*, the Court concludes that the ALJ's RFC

16 assessment was sufficiently specific as to the frequency of

17 Rowland's need to alternate sitting and standing.  In fact, the

18 ALJ's RFC assessment may have been overly generous to Rowland.  The

19 vast majority of the evidence in the record concerning Rowland's

20 need to for a sit/stand option was predicated on her own subjective

21 complaints which were properly discounted.  When you consider the

22 fact that Rowland had the ability and desire to go on a seven-week

23 trip to the other side of the country, it seems to be a logical

24 inference that her need to alternate sitting and standing could "be

25 accommodated by scheduled breaks and a lunch period."  SSR 96-9p,

26 1996 WL 374185, at *7.  In any event, the record suggests, at the

27 very best for Rowland, that her RFC included an at-will sit/stand

28

Page 20 - FINDINGS AND RECOMMENDATION

1  option, as in *Buckner-Larkin*.   There was no error here, much less

2  harmful error.

3  **C.   Divergence from the Dictionary of Occupational Titles**

4      Finally, Rowland argues that the ALJ erred by relying on VE

5  testimony  that  "diverged  widely"  from  the  Dictionary  of

6  Occupational Titles ("DOT").   (Pl.'s Opening Br. at 10.)   As

7  Rowland explains,

8          [t]he ALJ's sedentary capacity finding precludes the
           performance of each and every [l]ight level job described
9          by the [DOT]. . . . [Yet,] the VE named only [l]ight jobs
           in response to the sedentary, unspecified-frequency-sit-
10         stand hypothetical.  Hence, the VE diverged from the DOT
           in two ways: (1) [s]he identified only [l]ight jobs in
11         response to [s]edentary restrictions; and (2) [n]one of
           the jobs she identified describe a sit/stand option with
12         unspecified sitting and standing frequency.

13  (Pl.'s Opening Br. at 10.)

14      This second argument was raised and rejected by Judge Marsh in

15  *Swofford*: "[The claimant] also argues that the 'sit/stand option'

16  deviated from the DOT.   *The DOT, however, does not include such*

17  *postural requirements.   The ALJ was entitled to rely on the VE's*

18  *expertise in this respect.*"  *Swofford*, 2013 WL 3333063, at *7 n.3

19  (emphasis added).   As in *Swofford*, the ALJ was entitled to and did

20  rely on the VE's expertise.

21      In addition to relying on her own experience and expertise,

22  (Tr. 60) ("And [your testimony] was based on your experience and

23  research you've done?   A. Yes."), it also appears that the VE

24  relied on labor market surveys.   *Cf. Buckner-Larkin*, 450 F. App'x

25  at 628 ("The vocational expert noted that although the DOT does not

26  discuss a sit-stand option, his determination was based on his own

27  labor market surveys, experience, and research.")  The VE explained

28  that available labor market surveys indicated, for example, that

Page 21 - FINDINGS AND RECOMMENDATION

1  there were "approximately 700 sedentary [electronic worker] jobs in
2  the [regional] labor market [and] 49,000 nationally." (Tr. 59.)
3  The ALJ then inquired as to whether the sedentary electronic worker
4  jobs would allow for a sit/ stand option. The VE acknowledged that
5  these positions "w[ould] allow for a sit/stand option." (Tr. 59.)

6      As to the first argument, it is evident that the VE was not
7  merely identifying "lights jobs" in response to a hypothetical
8  concerning sedentary restrictions. The VE acknowledged that the
9  DOT described the cashier II position (*e.g.*, booth cashier and
10 ticket seller) as light; however, she went on to state that "there
11 [we]re subcategories" that qualified as sedentary work with an at-
12 will sit/stand option. (Tr. 58-59.) The same can be said about
13 the VE's testimony regarding electronic workers: "The DOT also
14 describes this as light, unskilled work, SVP 2. However, available
15 labor market research indicates there are approximately 700
16 sedentary jobs in the labor market or 49,000 nationally." (Tr.
17 59.)

18     The ALJ unequivocally stated that both of these sedentary
19 positions (i.e., the subcategories of cashier II and electronic
20 worker) would "allow for a sit/stand option and [qualified as]
21 simple, repetitive work." (Tr. 59.) When the ALJ asked the VE
22 whether her testimony was consistent with the DOT, she provided the
23 following response: "Yes. . . . Expect as I otherwise mentioned."
24 (Tr. 60.)

25     In *Distasio v. Shalala*, 47 F.3d 348 (9th Cir. 1995), the Ninth
26 Circuit stated: "We are aware that the [DOT] classifies work as
27 either 'light' or 'sedentary,' as between the two categories, and
28 does not refine the categories further. But vocational experts can

Page 22 - FINDINGS AND RECOMMENDATION

testify whether particular applicants for disability benefits would be able to perform subcategories of jobs within the DOT." *Id.* at 350.   That is precisely what the VE did here.   There was no unexplained divergence from the DOT, as Rowland posits.

In summary, the Court concludes that the ALJ's findings were supported by substantial evidence and were free of legal error. Even assuming for the sake of argument that the ALJ had erred, the Court would nevertheless conclude that any error was harmless because "no reasonable ALJ . . . could have reached a different disability determination." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

## VI. CONCLUSION

For the reasons stated, the Commissioner's decision should be AFFIRMED.

## VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.   Objections, if any, are due **September 23, 2013.**   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.   If objections are filed, then a response is due **October 10, 2013.**   When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 3rd day of September, 2013.

/s/ Dennis J. Hubel

_____
        DENNIS J. HUBEL
  United States Magistrate Judge